UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case Number: 18-24950-CIV-JEM

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

    Plaintiff,

v.

INTERNATIONAL MARINE CORPORATION, a
Cayman Islands Company,

    Defendant.
_____/

## **ORDER**

**THIS CAUSE** is before the Court upon the Findings of Facts and Conclusions of Law submitted by Special Master Reginald M. Hayden, Jr. in resolution of a dispute over the division of insurance proceeds following a boat casualty. (DE 15). In the report, Special Master Hayden concluded that, pursuant to federal maritime law and principles of equity, Defendant was entitled to an award of $345,273.10. (*Id*.). Plaintiff, National Union Fire Insurance Company ("National Union") and Defendant, International Marine Corporation ("IMC") both filed objections. The Court has reviewed the submissions of the parties, and the record in this case, and is fully advised. After careful consideration, the Special Master's Report is **ADOPTED**, and the objections filed by National Union (DE 18) and IMC (DE 25) are **OVERRULED**.

    **I.**    **INTRODUCTION**

As set forth in the Special Master's report and stipulated by the parties, the following facts are undisputed. On December 21, 2014, M/Y Chairman (the "Vessel") was moored behind the home of Robert Falk, at Ocean Reef, Florida, upon the navigable waters of the United States. Falk

was the principal corporate owner and sole representative of Defendant, IMC. Falk was at his home in Tennessee at the time the Vessel, at its berth, was found by neighbors to be low and taking on water in its engine room. Neighbors took steps to save the Vessel, including calling a salvage company to assist in the Vessel's dewatering. The Vessel was thereafter towed to Rolly Marine Services, Inc. ("Rolly"), a repair yard in Fort Lauderdale, Florida.

It was later discovered that recent repairs to the Vessel's air conditioning system by a company called CMAC Systems, Inc. ("CMAC") had been negligent and that the decoupling of a poorly-secured air conditioning hose from a PVC fitting had triggered the entire event. (DE 25-2). The parties jointly sued CMAC and recovered settlement proceeds of $850,000.

The Vessel remained at Rolly for almost three-and-a-half years due to disputes over whether certain repairs were insured or not. National Union ultimately paid $1,360,673 for repairs as a result of the incident. IMC incurred an additional $281,240 for so-called "owner's work" or "additional work" (performed outside of Rolly). Special Master Hayden noted that "[t]here is testimony that some of the work was to correct damages caused during the extensive repairs" and "[a]rguably, this work would be covered under the policy." (DE 15: 7 and n. 4). In any event, the collective repairs far exceeded the amount of the CMAC settlement. Thus, the appropriate distribution of the CMAC settlement sum, against the backdrop of the applicable insurance policy and case law is the matter presently in dispute between the parties.[1]

To help resolve this dispute, the Court appointed Special Master Hayden at the request of the parties. The scope of the Special Master's appointment was to "[d]etermine the amount that

---

[1] Although IMC executed a release in favor of National Union to resolve matters under the policy, the release specifically excludes matters relating to the division of the CMAC settlement proceeds. (DE 17-1 ¶ 14).

International Marine has to receive to be 'made whole.' For purposes of this determination, being 'made whole' consists of International Marine receiving all amounts that it was legally entitled to recover as tort damages from CMAC Systems, Inc." (DE 13).

## II. THE SPECIAL MASTER'S REPORT

As relevant here, Special Master Hayden made two conclusions with respect to the dispute. First, he determined that admiralty jurisdiction governed the dispute and that the policy did not provide "loss of use" coverage in any event, foreclosing this aspect of the damages requested by IMC. Special Master Hayden explained:

> IMC is claiming an additional $2,276,344.00, of which $1,120,000 is specifically for loss of use, for over three and a half years. Under the [National Union] policy, there can be no claim for loss of use, as hereafter shown, and the loss of use claim must fail in its entirety. Florida Law does not apply in this case. This case is governed by Federal Admiralty and Maritime Law, as provided both, in the policy and by the case law. The Policy provides . . . . 'Any dispute regarding the coverage afforded under the Policy shall be governed by the rules and principles of Federal Admiralty law' . . . . The Policy also provides . . . . 'Except otherwise provided in PART A: PROPERTY DAMAGE COVERAGE, we do not cover any loss of use' . . . .
>
> Under Admiralty Law there generally can be no claim for loss of use for a private pleasure vessel. Loss of use of a private pleasure boat is not a compensable item of damages under Federal Maritime Law.

(DE 15: 8-9 (citing *The Conqueror*, 166 US 110 (1897) and *Corp. v Jones Boatyard. Inc.*, 206 F. 3d 1373 (11th Cir. 2000)).

Second, Special Master Hayden concluded that a substantial amount of the damages claimed by IMC were for so-called "betterment," in other words, repairs not related to the loss, and therefore not compensable:

> IMC (through Mr. Falk) has made a substantial claim for many repaired items, which amounts to betterment, and were not caused by the water intrusion. I give great weight to the testimony of Greg Poulos, who was deeply involved in the

>work done to the Vessel at Rally Marine, the repair facility. I find the testimony of Mr. Poulos to be brutal, compelling and persuasive. I quote briefly from his testimony: 'Mr. Falk wanted the insurance company to rebuild his boat for his lack of maintenance during the twelve years of his ownership.'
>
>Poulos was unsparing in his testimony about the poor condition and lack of regular and routine maintenance of the Vessel prior to the loss. Based on his observations, the Vessel had not been properly maintained for many years prior to this incident. Further, a great many of the repairs or replacements made were for 'betterment,' in order to repair long existing problems, for which Underwriters are NOT responsible, and for which there can be no subrogation claim. Betterment is not covered under the Policy.

(DE 15: 11-12 (footnotes omitted)).

Special Master Hayden again emphasized that "[m]any of the items claimed are for betterment, for which there can be no recovery against National Union under the policy or in any subrogation claim." Nevertheless, he "found there should be equitable considerations concerning IMC's claims."  (*Id*.: 14).

Based on this rationale, Special Master Hayden made the following determination: "From the $850,000 in trust received in settlement from CMAC, IMC and Mr. Falk are entitled to: $23,000.00 (the deductible) and $41,033.10 ( . . . for reimbursement of expenses not compensated from Rolly Marine) and $281,240 which Mr. Falk testified he paid, out of pocket, to complete the job and get the yacht out of the yard." (*Id*.: 16 (citation omitted)). With respect to the $281,240, the Special Master explained in a footnote that "IMC also claimed $70,174 for Owner expenses. I considered this to be part of the $281,240 awarded for additional work caused during the long repair process. Arguably, they could be considered 'sue and Labor' expenses." (*Id*. at n. 11).

The Special Master summed up his findings as follows: "I find it is equitable, as admiralty is a court of equity, to award these amounts to IMC. . . . Accordingly, the TOTAL of $345,273.10 will be the amount of recovery by IMC from the monies held in trust" with the balance to be

remitted to National Union. (*Id*.: 16-17).

Following the report, both parties filed objections. National Union takes aim at Special Master Hayden's equitable award of $281,240 for "owner's work" or "additional work" while IMC argues that diversity jurisdiction and hence Florida law applies, rather than admiralty law, and therefore "loss of use" damages should have been awarded by the Special Master.

### III. LEGAL STANDARD

Pursuant to Rule 53(f)(4), the Court must use a *de novo* review for all objections to legal conclusions recommended by the Special Master. Fed. R. Civ. P. 53(f)(4); *see also Martin v. Univ. of S. Ala.*, 911 F.2d 604, 608 (11th Cir. 1990). Pursuant to Fed. R. Civ. P. 53(f)(3)(B), the parties stipulated that Special Master Hayden's findings of fact would be final and therefore they will be accepted as set forth in the Special Master's report. (DE 11; DE 13).

### IV. ANALYSIS

#### A. Whether Maritime Law Applies to this Dispute

IMC points out that National Union alleged diversity jurisdiction in its Complaint and urges that this dispute is nothing more than a declaratory action regarding the division of settlement proceeds, which has nothing to do with maritime law. According to IMC, National Union is now stuck with Florida law. The Court disagrees.

The tort that caused the casualty occurred on navigable waters, which triggered federal admiralty jurisdiction and therefore maritime law under well-established precedent, irrespective of the jurisdictional allegations of the pleading. Indeed, "Federal courts 'have developed a reverse-Erie doctrine, by virtue of which the same federal maritime law applies in maritime cases, whether the case is brought in state court or in federal court based on diversity jurisdiction.'" *Langen v. Spencer Yachts, Inc*., 2010 WL 11602605, *2 (S.D. Fla. 2010) (quoting *Mink v. Genmar Industries,*

*Inc.*, 29 F. 3rd 1543, 1548 (11th Cir. 1994)); *see also Crouch v. Carnival Corporation*, 2007 WL 9702149 (S.D.Fla. 2007) (applying maritime law despite diversity allegations in the pleading).

Thus, to determine whether the action is a maritime claim subject to the federal maritime jurisdiction, the United States Supreme Court developed a two-pronged test based on the locus of the incident, and the incident's nexus to maritime commerce. *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 258-261 (1972); *Sisson v. Ruby*, 497 U.S. 358, 364 (1990). IMC does not dispute that the locus element is satisfied. (DE 25:13). This leaves the question of nexus. To establish this element, there must be evidence of "a potentially disruptive impact on maritime commerce," *Sisson*, 497 U.S. at 364 n. 2, and "a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity." *Id.*

Applying these precepts here, it is plain that the nexus requirement has been satisfied. Although IMC argues that no actual disruption to maritime commerce occurred, this is not relevant to the Court's inquiry, which merely requires a showing that the tort could have a "potentially" disruptive impact on maritime commerce. Here, the facts demonstrate that the Vessel was disabled in a navigable waterway with direct access to the Atlantic Ocean, which required the services of a commercial salvor and towing to a Fort Lauderdale shipyard. Certainly, the flooded Vessel could have sunk and, at minimum, disrupted the navigability of the waterway. The Vessel could have introduced oil or other contaminants into the waterway, the salvage boat could have been imperiled while dewatering the Vessel, or the tow boat could have collided with another boat while towing Vessel. These scenarios are not difficult to envision. Furthermore, the tort in this case, which occurred in connection with a boat repair at a private dock had a "substantial relationship to traditional maritime activity." *See Sisson*, 497 U.S. at 367 ("We therefore conclude that . . . storing

and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity.").

The Court rejects IMC's argument that this is a mere declaratory action about the division of settlement proceeds and has "almost no admiralty connection." (DE 25: 7). The predicate of this entire case is a casualty occurring on a ship in a navigable waterway subject to an insurance policy in which the parties elected maritime law to govern their coverage dispute. The connection to admiralty is quite strong. Accordingly, maritime jurisdiction applies.

Having concluded that maritime law applies, it well settled that loss of use damages are unavailable. Under general maritime law, loss of use damages may not be awarded to a pleasure vessel. Rather, "[there] must be a pecuniary loss . . . and not a mere inconvenience arising from an inability to use the vessel for the purposes of pleasure." *The Conqueror*, 166 U.S. 110, 133 (1897); *Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1376 (11th Cir. 2000). Furthermore, as the Special Master correctly observed, the policy in question specifically excludes loss of use damages in any event. This measure of damages, therefore, is simply not compensable and the Special Master did not err in so concluding.

### B.  Whether the Special Master Erred in Awarding Owner's Work to IMC

For its part, National Union objects to the Special Master's report on the basis that he awarded IMC $281,240 worth of "betterment" damages, which is expressly forbidden by case law. Indeed, the Special Master distinctly noted that many of the items for which IMC sought compensation were merely elective upgrades or repairs necessitated by 12 years of neglect rather than water intrusion. National Union takes issue with the fact that the Special Master evidently awarded these damages pursuant to equitable considerations rather than the dictates of the policy or case law.

Although the Court agrees that it would be improper to award betterment damages by equity where expressly forbidden by law, the Court concludes that the damages National Union classifies as "betterment" damages are not betterment damages at all. It appears National Union improperly conflates the terms "owner's work" "betterment" and "additional work" as part of the same basket of expenses. A careful review of the transcripts and supplied exhibits in this case reveals that this is untrue. The damages that the Special Master called "additional work" or "owner's work" was work not performed by Rolly, but by third-party vendors as evidenced in Exhibit 85, Part B. (DE 24-1). The heading for those itemized invoices (amounting to $281,240) is "Correctional and Additional Expenditures Outside of Rolly Marine." (*Id*.). As painstakingly discussed in transcripts (DE 16-3), these expenses were for repairs incidental to the loss but reasonably within its scope, for instance, repairs to parts of a system that were not directly flooded but required repair for proper function or aesthetics (such as wiring, paint matching, and cleaning), procurement of tools, repairs due to scratches or damage incurred during the repair process, and general deterioration due to the ship remaining out of service for an extended period of time. The Special Master expressly opined that they were covered by the policy. (DE 15: 7 n. 4). These invoices were not for "betterment" and the Special Master never suggested they were.

Notwithstanding, apparently in a concession to National Union, the Special Master decided to, in effect, equitably reduce the $281,240 amount contained in Part B by the $70,174 amount enumerated as "Owner's Expenses" in Part D. (DE 15: 16 n. 11). The Special Master stated that he considered both parts together and determined that the appropriate total compensation (exclusive of the other categories of damages) would be $281,240. This award is sufficiently supported by the record and the Court sees no legal error in this regard.

For the foregoing reasons, Special Master Hayden's report (DE 15) is **ADOPTED**. The

objections of National Union (DE 18) and IMC (DE 25) are **OVERRULED**. IMC shall submit a proposed final judgment to Chambers no later than **February 15, 2021**

**DONE AND ORDERED** in Chambers, Miami, Florida, this 8th day of February 2021.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE